UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NATIONAL RAILROAD PASSENGER
CORPORATION,

                          Plaintiff,

        -against-

AMERICAN PREMIER UNDERWRITERS,
INC.,

                          Defendant.

**COMPLAINT**

**1:23-cv-03784**
Case Number

Plaintiff, National Railroad Passenger Corporation ("Amtrak" or "Plaintiff"), by and through counsel, hereby alleges as follows:

## **INTRODUCTION**

1.      Amtrak currently owns and operates New York Penn Station ("Penn Station").  In 2016, Amtrak discovered polychlorinated biphenyls (PCBs), a hazardous substance, on track beds there.  In the years since, it has investigated the scope, extent, and source of the PCBs in coordination with State and federal regulators and has begun the process of cleaning them up. To date, Amtrak has spent more than $30 million on this work and likely may need to spend much more in the future.

2.      Amtrak is not solely, or even predominantly, responsible for the PCBs at Penn Station.  Penn Central Transportation Company ("Penn Central") and the Pennsylvania Railroad ("PRR"), the corporate predecessors of Defendant American Premier Underwriters, Inc. (collectively, "APU"), owned and operated Penn Station before 1976 and owned and operated trains that discharged PCBs there.  PCBs were discharged at Penn Station from transformers

installed on trains from as early as the 1930s, long before Amtrak acquired Penn Station in 1976. Commercial production of PCBs ceased in the United States in 1977, and the U.S. Environmental Protection Agency (EPA) banned the use of PCBs in 1979.

3.     But APU has not paid *any* of the costs to clean up the PCBs at Penn Station. So Amtrak brings this action pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 *et seq.* ("CERCLA") to recover the cleanup costs that APU should rightfully bear.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this Complaint pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. §§ 1331 and 1349.

5.     Venue is proper under 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 9613(b), because the events giving rise to the claims asserted in this Complaint are based on rail service operations and activities that took place in this District and resulted in the release of PCBs at Penn Station, which is located in this District.

## PARTIES

6.     Amtrak was created by the Rail Passenger Service Act of 1970. 45 U.S.C. § 502 *et seq.*, now codified at 49 U.S.C. § 24101 *et seq.* Amtrak has its principal place of business in Washington, D.C. and possesses legal capacity to sue.

7.     Defendant APU is a Pennsylvania corporation that maintains a principal place of business at One East Fourth Street, Cincinnati, Ohio 45202. APU is a corporate successor to Penn Central, which owned and operated Penn Station, conducted rail service operations there,

and was a successor to PRR and other companies.

**FACTS**

8.      In 1970, Penn Central filed for reorganization under the Bankruptcy Act of 1898. Penn Central's bankruptcy, among other factors, led Congress to create Amtrak to continue intercity rail service.

9.      In 1971, Penn Central and Amtrak entered into an agreement under which Amtrak undertook to perform Penn Central's intercity passenger rail service, including service in and out of Penn Station, and Amtrak was to pay Penn Central for the service of operating Amtrak's intercity rail service. The 1971 agreement also provided a structure for Amtrak to purchase from Penn Central the train engines and passenger cars needed to operate that service.  Penn Central retained the tracks, stations and other facilities needed to operate that service, but agreed to maintain the utility of those facilities.

10.     On April 1, 1976, Amtrak acquired rail facilities within the Northeast Corridor previously owned or operated by Penn Central.  Penn Station was one of those facilities.  Amtrak has owned and operated Penn Station since then.

11.     From as early as the mid-1930s through the mid-1990s, certain types of train engines and cars, including ones that used transformers cooled by a PCB-containing fluid, were used by trains servicing Penn Station.  When those transformers would get too hot, they would release—sometimes by design—the PCB-containing fluid, which would discharge from the engines and then onto the track beds below.

12.     Releases and discharges of PCBs from train engines indisputably occurred at Penn Station before March 31, 1976, when it was owned and operated by PRR and Penn Central. And PRR and Penn Central owned or operated various models of train engines that discharged

PCBs at Penn Station before April 30, 1971, and between April 30, 1971 and March 31, 1976.

13.     As a result of APU's release and discharge of PCBs at Penn Station over the course of many decades, areas of Penn Station are contaminated with PCBs.

14.     Amtrak discovered that contamination in 2016 when it sampled substances collected from track beds at Penn Station.  It then promptly disclosed this discovery to EPA and the New York Department of Environmental Conservation (DEC).

15.     Amtrak, in consultation with EPA and DEC, began the process of investigating the scope and extent of PCB contamination at Penn Station.  Amtrak also removed some of the PCB-contaminated substances it found.

16.     Amtrak's investigation and removal work have been necessary to protect human health and the environment, and they have been conducted consistent with applicable state and federal regulations, including the National Contingency Plan (NCP) and regulations issued by EPA under the Toxic Substances Control Act.  15 U.S.C. § 2601 *et seq.*

17.     Amtrak has notified relevant regulatory agencies and other stakeholders about its work at Penn Station. Amtrak provides monthly updates to both EPA and DEC, who oversee these activities.  Amtrak also has provided information about its investigation and removal work at Penn Station to potentially impacted parties, including APU and other responsible parties and workers at Penn Station.

18.     Amtrak's investigative and removal work at Penn Station since 2016 has cost the company tens of millions of dollars.  As of August 25, 2022, costs have exceeded $34,000,000. Amtrak estimates that future investigation and cleanup work will cost at least $11,900,000 more.

19.     APU has paid no costs to respond to the PCBs Amtrak discovered at Penn Station

in 2016.

20.     Amtrak has provided a copy of this Complaint to the Attorney General of the

United States and to the Administrator of EPA, in accordance with section 113(*l*) of CERCLA,

42 U.S.C. § 9613(*l*).  A copy of this communication is attached as Exhibit A.


### FIRST CAUSE OF ACTION
**Cost Recovery Under CERCLA Sections 107(a) and 113(g)(2)**

21.     Amtrak incorporates the allegations in the preceding paragraphs.

22.     CERCLA § 107(a)(1)-(4)(B) empowers "any . . . person" to recover "necessary

costs of response" incurred "consistent with the national contingency plan," plus interest,

"notwithstanding any other provision or rule of law." 42 U.S.C. § 9607(a)(1)-(4)(B). In the event

of (1) a release or threatened release, (2) from a facility, (3) of a hazardous substance, (4) which

causes incurrence of response costs, persons incurring response costs can recover from any entity

that falls within the four categories of parties deemed liable under CERCLA. 42 U.S.C. §

9607(a)(1)-(4)(B).

23.     The four classes of liable parties under CERCLA include: (1) the current owner or

operator of a facility, (2) any person who owned or operated any facility at the time of disposal

of hazardous substances, (3) any person who arranged for disposal or treatment of hazardous

substances, and (4) any person who accepts hazardous substances. 42 U.S.C. § 9607(a)(1)-(4).

24.     APU is a "person" as defined by CERCLA section 101(21), 42 U.S.C. §

9601(21).

25.     Penn Station is a "facility" as defined by CERCLA section 101(9), 42 U.S.C. §

9601(9).

26.     PCBs are a "hazardous substance" within the meaning of CERCLA section

101(14), 42 U.S.C. § 9601(14), and are listed as such by EPA in 40 C.F.R. § 302.4.

27.     Each PCB-discharging train engine APU owned or operated is a "facility" as defined by CERCLA section 101(9), 42 U.S.C. § 9601(9).

28.     There has been a "release," or threatened "release," within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22), of hazardous substances into the environment at or from Penn Station and at or from the train engines.

29.     APU qualifies as an "owner or operator" of Penn Station at the time of "disposal" of PCBs there under CERCLA section 101(20), 42 U.S.C. § 9601(20).

30.     APU qualifies as an "owner or operator" of train engines at the time of "disposal" of PCBs from those engines under CERCLA section 101(20), 42 U.S.C. § 9601(20).

31.     The discharge and release of PCBs from train engines at Penn Station qualifies as "disposal" under 42 U.S.C. § 6903(3) and thus under CERCLA section 101(29), 42 U.S.C. § 9601(29).

32.     The costs Amtrak has incurred to date to investigate and clean up PCBs at Penn Station have been necessary to support cleanup actions that are, and will continue to be, consistent with the National Contingency Plan (NCP) as set forth in 40 C.F.R. § 300.

33.     APU is therefore strictly, and jointly and severally, liable as a responsible party, or as a successor in interest to such person, in connection with removal, investigation, and remedial actions associated with PCB contamination at Penn Station and is liable to Amtrak for the necessary costs of response that Amtrak has incurred to respond to the PCB contamination at Penn Station, plus accrued interest on those costs.

34.     Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides in pertinent part that in any action for recovery of costs, "the court shall enter a declaratory judgment on liability

for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."

35.     Amtrak is entitled to a declaratory judgment on liability against APU, pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), that will be binding in any subsequent action to recover further response costs incurred by Amtrak in connection with Penn Station.

36.     A declaratory judgment is also appropriate under 28 U.S.C. § 2201(a), because an actual controversy currently exists between Amtrak and APU with regard to APU's liability for the costs that Amtrak has incurred, and will incur, in connection with the cleanup and removal activities at Penn Station.  Amtrak will continue to incur substantial costs in connection with these activities.

**SECOND CAUSE OF ACTION**
**Contribution Under CERCLA Section 113**

37.     Amtrak incorporates the allegations in the preceding paragraphs.

38.     CERCLA section 113(f)(1) provides that any person may seek contribution from any other person who is potentially liable under CERCLA Section 107(a) during or following any civil action under CERCLA sections 106 or 107(a).  42 U.S.C. § 9613(f)(1).

39.     APU has not paid its equitable share of response costs at Penn Station.

40.     Amtrak has incurred response costs beyond its equitable share at Penn Station.

41.     If the Court concludes that CERCLA section 113 provides an appropriate mechanism for Amtrak to recover its response costs, plus accrued interest on those costs, under the circumstances alleged above, *see Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112 (2d Cir. 2010), APU is liable as a responsible party, or as a successor in interest to such person, in connection with removal, investigation, and remedial actions associated with PCB

contamination at Penn Station and is liable to Amtrak for APU's equitable share of the necessary costs of response that Amtrak has incurred to respond to the PCB contamination at Penn Station.

## PRAYER FOR RELIEF

42.     Based on the facts alleged above and to be proven at trial, Amtrak requests this Court enter a final judgment against APU that:

a.     Declares APU a responsible party under CERCLA section 107(a) for necessary response actions to address the PCB contamination at Penn Station;

b.     Declares APU jointly and severally liable for Amtrak's past costs of responding to PCB contamination at Penn Station under CERCLA section 107, or in the alternative, declare APU liable for its equitable share of Amtrak's past costs to respond to PCB contamination at Penn Station under CERCLA section 113, with interest as allowed by law;

c.     Declares APU jointly and severally liability for Amtrak's future costs to respond to PCB contamination at Penn Station under CERCLA section 113(g)(2);

d.     Obligates APU to pay Amtrak damages in the amount of its necessary response costs, cleanup and removal costs, or APU's equitable share of those costs, in each instance with interest as allowed by law;

e.     Declares APU liable for Amtrak's future costs as allowed by law;

f.     Awards Amtrak its costs and fees, including attorneys' and experts' fees, as allowed by law in this action; and

g.     Grants such other relief as the Court deems appropriate.

May 4, 2023

By: _____

Joseph J. Saltarelli
**HUNTON ANDREWS KURTH LLP**
200 Park Avenue
New York, NY 10166-0005
(212) 309-1136
jsaltarelli@HuntonAK.com

George P. Sibley, III
(to be admitted pro hac vice)
Gregory R. Wall
(to be admitted pro hac vice)
Paul T. Nyffeler
(to be admitted pro hac vice)
**HUNTON ANDREWS KURTH LLP**
951 East Byrd Street
Richmond, VA 23219-4074
(804) 788-8200
gsibley@HuntonAK.com
gwall@HuntonAK.com
pnyffeler@HuntonAk.com

Matthew Z. Leopold
(to be admitted pro hac vice)
Erin Grisby
(to be admitted pro hace vice)
**HUNTON ANDREWS KURTH LLP**
2200 Pennsylvania Ave., NW
Suite 900
Washington, DC 20037-1701
(202) 955-1500
mleopold@HuntonAK.com
egrisby@HuntonAk.com